IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| SECURE WI-FI, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | NO. 2:24-CV-00047-JRG |
| SAMSUNG ELECTRONICS CO. LTD. and | § | |
| SAMSUNG ELECTRONICS AMERICA, | § | |
| INC. | § | |
| | § | |
| Defendants. | § | |

# CLAIM CONSTRUCTION ORDER

In this patent case, Secure Wi-Fi, LLC, alleges infringement by Samsung Electronics Co. Ltd., and Samsung Electronics America, Inc., (together, "Samsung") of claims from U.S. Patent Nos. 9,717,005, 9,961,552, and 10,694,384. The patents, which are related and share the same disclosure,[1] concern inventions for preventing third parties from determining the location of end devices when those devices are connecting to wireless networks. *See generally* '005 Patent at [57].

The parties present five disputes. Having considered the parties' briefing, along with arguments of counsel made at a June 3, 2025 hearing, the Court resolves those disputes as follows.

## I.   BACKGROUND

The patents relate to "connecting to wireless networks while preventing leakage of location information of an end device." '005 Patent at 2:62–63. For an end device to connect to a wireless

---

[1] *See* '384 Patent at [63] (characterizing the underlying application as a "continuation of application No. 14/693,400, . . . now Pat. No. 9,961,552, which is a continuation of application No. 13/885,754, . . . now Pat. No. 9,717,005").

local area network (WLAN), the end device first searches for nearby and available access points. *Id.* at 2:65–66. When searching for access points, the end device transmits a probe request frame that includes a device identifier, such as the device's media access control (MAC) address. *Id.* at 3:1–5. When the end device transmits this probe request frame, the access point replies with a probe response frame that includes identifying information, such as the access point's MAC address or service set identifier (SSID). *Id.* at 3:15–20. But because the end device transmits the probe request frame to all access points within range, the device's present location may be determinable, thereby potentially compromising the user's privacy. *Id.* at 3:5–11.

To address this problem, the patents teach the end device transmitting a probe request frame with a fake device identifier to the access points. *Id.* at 3:12–14. That fake device identifier may either be generated by or provided to the end device. *Id.* at 4:9–16. After an access point sends a probe response frame, as shown in Figure 3 (below), the end device can determine "whether there is an authenticated access point around the end device based at least in part on the information included in the probe response frame." *Id.* at 3:22–25.



**Figure 3 of the patents**

Once the end device finds an authenticated access point, the device will send a connection request to that access point using the authentic device identifier, such as an original MAC address. *Id.* at 3:26–28. Ultimately this results in the end device connecting to a "wireless local area network provided by the authenticated access point without a leakage of present location information" to undesired and unauthenticated access points. *Id.* at 3:30–32.

The independent claims of the patents are similar, but use slightly different terms. For example, Claim 1 of the '005 Patent refers to "device identifiers":

> 1. A method performed under control of an end device, the method comprising:
>
> receiving a fake device identifier from a mobile operating server;
>
> transmitting, to an access point, a probe request frame that includes the fake device identifier for the end device;
>
> receiving, from the access point, a probe response frame that includes information regarding the access point;
>
> determining that the access point is an authenticated access point based at least in part on the information in the probe response frame that indicates that:
>
> the access point is controlled by the mobile operating server, and
>
> the access point was connected with the end device previous to when the access point received the transmitted probe request frame; and
>
> transmitting, to the access point determined to be the authenticated access point, a connection request that includes an authentic device identifier for the end device.

'005 Patent at 10:55–11:7. The claims of the '552 Patent and '384 Patent recite MAC addresses rather than "device identifiers." For example, Claim 1 of the '552 Patent recites:

> 1. A method performed by a server, the method comprising:

> > transmitting, by the server to a device, an authenticated access point list that includes at least one of a media access control (MAC) address or a service set identifier (SSID) of each of one or more authenticated access points, wherein the one or more authenticated access points are controlled by the server; and
>
> > transmitting, by the server to the device, a fake device identifier, wherein the fake device identifier includes at least one of one or more random numbers or one or more random characters to falsely identify the device in a probe request frame in a search for at least one of the one or more authenticated access points around the device.

'552 Patent at 10:60–11:7. Similarly, Claim 1 of the '384 Patent recites:

> 1. A method performed under control of an end device, the method comprising:
>
> generating, by the end device, a fake media access control (MAC) address for the end device;
>
> transmitting, by the end device to an access point, a probe request that includes the fake MAC address;
>
> receiving, by the end device from the access point, a probe response that includes information regarding the access point;
>
> determining, by the end device, that the access point is an authenticated access point based, at least in part, on the information in the probe response being indicative that the access point was connected with the end device previous to when the access point received the probe request transmitted by the end device; and
>
> transmitting, by the end device to the access point determined to be the authenticated access point, a connection request that includes an authentic device identifier for the end device.

'384 Patent at 11:6–25.

The parties have five general disputes from the patents. First, they dispute whether an "authenticated access point" requires authentication "before granting access to the access point."

Second, they dispute the extent to which the meanings of three terms—"authentic device identifier," "actual original MAC address," and "actual MAC address"—overlap. Third, they dispute whether the "end device" and "server" must be different physical devices within the meaning of these claims. Fourth, they dispute what it means for an access point to be "controlled by the server." Finally, they dispute whether an "access point" is limited to Wi-Fi networks.

## II. LEGAL STANDARDS

### A. Generally

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*). As such, if the parties dispute the scope of the claims, the court must determine their meaning. *See, e.g., Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1317 (Fed. Cir. 2007) (Gajarsa, J., concurring in part); *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996), *aff'g*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*).

Claim construction, however, "is not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Rather, "[c]laim construction is a matter of [resolving] disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims . . . ." *Id.* A court need not "repeat or restate every claim term in order to comply with the ruling that claim construction is for the court." *Id.*

When construing claims, "[t]here is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citing *Phillips*, 415 F.3d at 1312–13). Courts must therefore "look to the words of the claims themselves . . . to define the scope of the patented invention." *Id.* (citations omitted). The "ordinary and customary meaning of a claim term is the meaning that the term would

have to a person of ordinary skill in the art in question at the time of the invention, *i.e.,* as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

Intrinsic evidence is the primary resource for claim construction. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Phillips*, 415 F.3d at 1312). For certain claim terms, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314; *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."). But for claim terms with less-apparent meanings, courts consider "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean . . . [including] the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314.

### B. Indefiniteness

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). The claims "must be precise enough to afford clear notice of what is

claimed" while recognizing that "[s]ome modicum of uncertainty" is inherent due to the limitations of language. *Id.* at 909. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

### III. THE LEVEL OF ORDINARY SKILL IN THE ART

The level of ordinary skill in the art is the skill level of a hypothetical person who is presumed to have known the relevant art at the time of the invention. *In re GPAC*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). In resolving the appropriate level of ordinary skill, courts consider the types of and solutions to problems encountered in the art, the speed of innovation, the sophistication of the technology, and the education of workers active in the field. *Id.* Importantly, "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).

Here, the parties' experts generally agree on the appropriate level of skill in the art. Secure's expert characterizes a skilled artisan as one with "at least a bachelor's degree in electrical engineering, computer engineering, computer science, or a similar field, along with two years of experience designing or developing wireless networks." Akl Decl., Dkt. No. 57-2 ¶ 32. Samsung's expert considers the proper level of skill to be someone with "at least a four-year degree in computer engineering, computer science, or a similar discipline, and at least 2 years of professional experience in networking and network-based systems or applications fields, or an equivalent level of skill, knowledge, and experience." Wicker Decl., Dkt. No. 60-1 ¶ 39. Samsung's expert also contends that a skilled artisan "would be aware of, and generally knowledgeable, regarding standards appliable to well-known methods for communication such as Wi-Fi, Bluetooth, and 3G." *Id.* ¶ 40. Neither party, however, suggests resolving the disputes turns on resolving the differences between the parties' experts' proposed levels of ordinary skill.

## IV.  THE DISPUTED TERMS

### A. "authenticated access point" ('384 Patent, Claims 1–4, 6–15, 17–20, 22–24; '552 Patent, Claims 10–11, 13–18, 20–22, 24–25, 28; '005 Patent, Claims 1–5, 7–17)

| Secure's Construction | Samsung's Construction |
|---|---|
| No construction necessary<br><br>"authenticated" should be given its plain and ordinary meaning | "access point that is proven to be genuine based on a process of verifying the identification of the access point using trusted and verifiable information, before granting access to the access point" |

The parties' dispute centers on the word "authenticated." Samsung says Secure unequivocally defined "authentication" in a related IPR proceeding. Dkt. No. 60 at 3. That definition, says Samsung, is also supported by technical dictionaries and the claim's structure. *Id.* at 4–5 (citing dictionaries), 5–6 (noting the last three limitations of Claim 1 of the '005 Patent require authentication "before granting access to the access point"). Secure does not propose a construction, but criticizes Samsung's requirement of authentication *before* granting access to the access point. Dkt. No. 57 at 6. Secure also calls the first part of Samsung's construction "a mishmash of numerous dictionary definitions." *Id.* at 7.

The main contention point concerns the last phrase of Samsung's construction, which requires an access point to be authenticated *before it may be accessed*. This language comes from Secure's preliminary response in the related IPR proceeding, where it criticized Samsung's petition for not addressing the meaning of "authenticating." Specifically, Secure wrote:

> Rather than describe what it means for an access point to be "authenticated" and whether that is disclosed within the proposed combination, Petitioners instead seek to equate [the asserted reference] with Petitioners' accused products in the underlying litigation, products which have vastly different functionality. Pet., 52.
>
> Petitioners thus fail to address that authentication is the process of verifying

the identity of an entity, using known, trusted, and verifiable information, before granting access to a resource.

Patent Owner's Prelim. Resp., Dkt. No. 60-8 at 21. Samsung's definition is based on the last sentence.

The Court agrees with Secure that including a temporal limitation is not warranted. The Court reads the last sentence as a general statement of what authentication is and when it is most likely to happen. Regardless of the timing of the verification, it's still authentication. Although that authentication is certainly more useful before exchanging information with the device, the Court finds no clear intent to redefine the term to *require* that. Secure correctly notes that any temporal requirement for when the authentication happens must come from other claim language.

The rest of Samsung's proposed construction, which stems from Secure's IPR statement, aligns with dictionary definitions submitted by both sides. The Court therefore construes "authenticated access point" as "an access point that has a verified identity based on known, trusted, and verifiable information."

    B.    "authentic device identifier" ('384 Patent, Claims 1–4, 6–15, 20; '552 Patent, Claims 10–11, 13–18, 20–22, 24–25, 28; '005 Patent, Claims 1–5, 7–17); "actual original MAC address" ('384 Patent, Claim 2); "actual MAC address" ('384 Patent, Claims 9–15, 17–20, 22–24)

| Secure's Construction | Samsung's Construction |
|---|---|
| No construction necessary | The words used to define the claimed identifier or MAC address—i.e., "actual original," "actual," and "authentic"—refer to the same thing and are therefore identical in claim scope.<br><br>If "actual original," "actual," and "authentic" do not refer to the same thing, each claim that recites the term is indefinite. |

These phrases are used in different claims to describe the content of the connection request

after the fake device identifier has been sent and the access point has been authenticated. For example, Claim 1 of the '005 Patent recites "receiving a fake device identifier from a mobile operating server," '005 Patent at 10:57–58, and later, after "determining that the access point is an authenticated access point," *id.* at 10:63–64, transmitting . . . a connection request that includes an *authentic device identifier* for the end device," *id.* at 11:4–7 (emphasis added). Similarly, Claim 2 of the '384 Patent distinguishes between "the fake MAC address" and "an actual original MAC address." '384 Patent at 11:26–28.

Samsung focuses on the words "authentic," "actual," and "original." It says the claim language requires "authentic" to mean the same thing as "actual" or "original," and the specification uses the words "authentic" and "original" interchangeably. Dkt. No. 60 at 9. And if the terms are not identical in scope, Samsung says the terms are "hopelessly ambiguous and therefore indefinite." *Id.* at 13. Secure agrees that "actual original MAC address" and "actual MAC address" have the same meaning, but says that's no reason to rewrite the terms. Dkt. No. 57 at 12.

To start, the parties agree that "actual original MAC address" and "actual MAC address" have the same meaning for purposes of this proceeding. Dkt. No. 57 at 13. The parties also agree that "authentic device identifier" is broader in the sense that a MAC address is one type of "device identifier." Dkt. No. 60 at 8 n.3 (agreeing "'device identifier' is not limited to MAC addresses, but rather also includes other types of device identifiers").

At the hearing, each party expressed valid concerns about the other's position. Secure correctly noted that, without a specific construction, Samsung's position would allow it to later choose which of "authentic," "actual," and "actual original" it likes best for its non-infringement position, likely opting for the latter and arguing an "authentic" device identifier must therefore be "original." Samsung countered that, without its construction, Secure might argue what it considers a fake

identifier is some sort of "authentic" fake identifier. Neither position is satisfying, and both seem like a tough sell based on the plain language of the claim.

That said, a party cannot avoid taking a position on the meanings of these terms by just asking the Court to hold they mean the same thing—whatever that may be. Samsung criticizes Secure for "not tell[ing] us about what 'authentic' actually is," Dkt. No. 60 at 8, but Samsung itself does the same thing. Rather than proposing separate constructions for "authentic," "actual," and "actual original," Samsung lumps them all together and says they either have the same meaning or they are indefinite. Yet "authentic" clearly has a different meaning than "original" and "actual." Nor can Samsung meet its burden on indefiniteness by avoiding any meaningful discussion of those terms' meanings.[2] In the end, the Court has little choice but to give them all "plain and ordinary meaning" constructions, but (1) "authentic device identifier" is not limited to an "actual MAC address," and (2) "actual original MAC address" and "actual MAC address" have the same scope.

> C. "server" ('552 Patent, Claims 10–11, 13–18, 20–22, 24–25, 28); "mobile operating server" ('005 Patent, Claims 1–5, 7, 8–17)

| Secure's Construction | Samsung's Construction |
|---|---|
| No construction necessary | plain and ordinary meaning where the server cannot be part of or reside within the "device" / "end device" |

Samsung frames this dispute as "whether [a] server, when read in light of the patentee's clear statements in the intrinsic evidence, can be part of or reside within [a] claimed end device." Dkt. No. 60 at 14–15. Samsung says it cannot because of allegedly disavowing statements made

---

[2] Samsung says "Secure's position makes the term 'authentic' incoherent," Dkt. No. 60 at 13, but that's an argument against Secure's position, not a reason why these terms are indefinite.

to the Patent Office during prosecution. *Id.* at 15–18. The claims, says Samsung, further confirm this by requiring a physically separate end device. *Id.* at 18.

Secure considers Samsung's construction an improper negative limitation on the recited server's location. Dkt. No. 57 at 14–15. Secure stresses "servers" are not limited to any physical location, and could reside in or be part of the end device. *Id.* at 16.

The Court agrees with Samsung. "Where a claim lists elements separately, the clear implication of the claim language is that those elements are distinct components of the patented invention." *Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) (internal quotation marks omitted). Here, each of the claims at issue recites "device," "access point," and "server" separately, giving rise to a presumption that each is a distinct component.

Secure tries, unsuccessfully, to rebut that presumption with Claim 10 of the '552 Patent. That claim recites:

> 10. A method performed by **a device**, the method comprising:
>
>> receiving, from **a server**, an authenticated access point list that includes information regarding one or more access points that are controlled by **the server**;
>>
>> receiving, from **the server**, a fake device identifier for **the device**, wherein the received fake device identifier includes at least one of one or more random numbers or one or more random characters to falsely identify **the device** in a probe request frame;
>>
>> transmitting, to at least one access point, the probe request frame that includes the received fake device identifier;
>>
>> receiving, from the at least one access point in response to the transmitting the probe request frame, a probe response frame that includes information regarding the at least one access point . . . .

'552 Patent at 11:58–20 (emphasis added). According to Secure, this claim highlights "that the

'server' is not prohibited from being a part of the device for which it is providing services.

The Court disagrees. The "device" is hardware, because it inherently includes a transmitter and receiver to transmit to and receive from the access point. Given that, Secure's interpretation of "server" must be software that is also part of the physical "device." In that case, the first and second limitations would mean the device is receiving from the "server" part of itself, which is a strained reading of these limitations.

Also, a skilled artisan would understand the "transmitting" and "receiving" limitations to be transmitting and receiving to and from the end device—not component-to-component communication *within* the device. Put differently, "transmitting" and "receiving" would not be used to describe passing information from one software module to another, or writing data from one memory location to another.

Finally, the specification consistently describes the "server" as a separate physical device. For example, Figure 1 (below) shows an "illustrative example of a network communications environment including a mobile operating server, an access point and an end device" that looks like a smartphone. '005 Patent at 2:16–18. The server is shown as a separate device wired to the access point. Nor would a skilled artisan understand a server that controls an access point or other network-centric features to be part of a subscriber's end device seeking to access the very network over which it already has, under Secure's position, some control.



**Figure 1 of the patents, showing a network communications environment (100), mobile operating server (110), access point (120), end device (130), and network area (140)**

In its reply, Secure says there is no dispute that some mobile phones can have a server and others cannot, Dkt. No. 61 at 6, but that is not the issue. Rather, the issue is whether such a server can satisfy the "server" limitation of the claims while also being part of the recited device. Based on the presumption set forth by *Becton*, which Secure has not rebutted, the Court holds it cannot. Although the Court will give this term a "plain and ordinary meaning" construction, it also holds the "server" cannot be part of or reside within the "device" or "end device" of the claims.

D.     "controlled by the mobile operating server" ('005 Patent, Claims 1–5, 7–17); "controlled by the server" ('552 Patent, Claims 10–11, 13–18, 20–22, 24–25, 28); "under control of the server" ('552 Patent, Claims 15–18, 20–22, 24–25, 28)

| Secure's Construction | Samsung's Construction |
|---|---|
| No construction necessary | Inventor disavowed "probing" from the claim scope for "controlled by" / "under control of." Otherwise, indefinite. |

Samsung asserts that, "whatever 'control' means in the context of the Asserted Patents, it does not include 'probing.'" Dkt. No. 60 at 23. Samsung bases that assertion on what it considers prosecution-history disclaimer. And if there is no such disclaimer, Samsung says these terms are indefinite because "control" includes any transmission requesting information. *Id.* at 25. Secure, however, disputes any disclaimer and accuses Samsung of misrepresenting its position about the meaning of "control." Dkt. No. 61 at 13. In Secure's view, "'control' of a first component (like an access point) by a second component (like a server) means that the second component manages, governs, or regulates how the first component functions." *Id.* at 14. "Control," says Secure, is not "the broadcasting of probes by default that may never be received by another device and do not manage, govern, or regulate a second device." *Id.*

Samsung's disclaimer position relates to arguments made by the applicant in response to a rejection based on U.S. Publication No. 2008/0052779 (Sinha). At the time, Claim 5 recited:

    5. A method performed by an access point, the method comprising:

        receiving, from a device, a probe request frame including a fake device identifier for the device, wherein the fake device identifier includes at least one of one or more random numbers or one or more random characters;

        transmitting, to the device, a probe response frame including information regarding the access point;

> receiving, from the device, a connection request including an authentic device identifier for the device; and
>
> transmitting, to the device, an approval of the connection request.

Dkt. No. 57-31 at 16–17. Claim 8 recited:

> 8. The method of Claim 5, wherein the access point includes at least one of [1] an access point controlled by a mobile operating server or [2] an access point connected with the end device.

*Id.* at 17. The examiner cited the combination of Sinha and another reference as disclosing the limitations of Claim 5 and 8. *Id.* at 6–7. In its remarks, the applicant explained:

> Sinha merely describes that a wireless laptop will continue to probe for APs that it has been connected to in the past (presumably equated to "access point previously connected with the end device" by the Office Action). However, Sinha fails to teach or suggest "wherein the access point is controlled by a server," as recited in amended independent Claim 5.

*Id.* at 29.

This is not disclaimer of *all* probing. At most, this is a disclaimer that a wireless laptop "continu[ing] to probe for APs that it has been connected to in the past" is not the access point being "controlled by a server." But a wireless laptop by itself is not a "server."

Regardless, the Court agrees that "probing," without more, is not "control." The ordinary meaning of "probing" is closer to "interrogating" than "controlling." Secure suggests "control" means "managing, governing, or regulating," but does not explain why "probing" falls within the scope of that phrase. Instead (and tellingly), it avoids the issue raised by Samsung, never directly addressing whether its position would, as Samsung puts it, "transform any communication that prompts a response into 'control.'" *See* Dkt. No. 61 at 12 (explaining that "when an access point merely broadcasts a probe response on its own by default, it is not a controlled device," but then

explaining "'[c]ontrol' would be when the access point is being managed, governed or regulated by another component"). Without some showing by Secure as to why "probing" is any one of "managing," "governing," or "regulating," the Court must give these terms "plain and ordinary meaning" constructions and hold "control" does not include merely requesting information and related responses.

E.     "access point" ('005 Patent, Claims 1–5, 7–17; '552 Patent, Claims 10–11, 13–18, 20–22, 24–25, 28; '384 Patent, Claim 1–4, 6–15, 17–20, 22–24)

| Secure's Construction | Samsung's Construction |
|---|---|
| No construction necessary | "infrastructure equipment that provides connectivity between a distribution system and remote stations over one or more Wi-Fi networks. Several access points can also provide connectivity over the same Wi-Fi network" |

Samsung says its construction is correct "because it provides the requisite technical clarity" and "aligns with the plain meaning of 'access point' as understood by a [skilled artisan]." Dkt. No. 60 at 29. Secure objects that Samsung's construction limits "access point" to Wi-Fi networks and says the specification shows otherwise. Dkt. No. 57 at 23–24.

The Court agrees with Secure, which provides evidence of other types of "access points." *See femtocell*, Wikipedia, Dkt. No. 57-25 at 4 (describing femtocell access points "connected using broadband IP, such as DSL or cable modems, to the network operator's core switching centres"); *Bluetooth Access Point Provides IoT Gateway Function*, Dkt. No. 57-27 (referring to a "Bluetooth Smart Ready Access Point"). Samsung, on the other hand, doesn't present any evidence a skilled artisan would understand "access point" as limited to Wi-Fi—only that it would *include* Wi-Fi. *See* Dkt. No. 60 at 29 (noting its position is "*consistent with* extrinsic sources, including the 802.11 Wi-Fi standard repeatedly referenced by both parties" (emphasis added)). Based on a dictionary

definition provided by Secure, the Court construes "access point" as "a device that establishes a point of access for a wireless signal to another network." *access point*, The Ultimate Wi-Fi Glossary, Dkt. No. 57-19 at 2 ("An access point is a device that establishes a point of access for a wireless signal.").

## V. CONCLUSION

| Disputed Term | The Court's Construction |
|---|---|
| "authenticated access point"<br>('384 Patent, Claims 1–4, 6–15, 17–20, 22–24; '552 Patent, Claims 10–11, 13–18, 20–22, 24–25, 28; '005 Patent, Claims 1–5, 7–17) | "an access point that has a verified identity based on known, trusted, and verifiable information" |
| "authentic device identifier"<br>('384 Patent, Claims 1–4, 6–15, 20; '552 Patent, Claims 10–11, 13–18, 20–22, 24–25, 28; '005 Patent, Claims 1–5, 7–17) | Plain and ordinary meaning |
| "actual original MAC address"<br>('384 Patent, Claim 2)<br><br>"actual MAC address"<br>('384 Patent, Claims 9–15, 17–20, 22–24) | Plain and ordinary meaning |
| "server"<br>('552 Patent, Claims 10–11, 13–18, 20–22, 24–25, 28)<br><br>"mobile operating server"<br>('005 Patent, Claims 1–5, 7, 8–17) | Plain and ordinary meaning |

| | |
|---|---|
| "controlled by the mobile operating server" ('005 Patent, Claims 1–5, 7–17)<br><br>"controlled by the server" ('552 Patent, Claims 10–11, 13–18, 20–22, 24–25, 28)<br><br>"under control of the server" ('552 Patent, Claim 15–18, 20–22, 24–25, 28) | Plain and ordinary meaning |
| "access point" ('005 Patent, Claims 1–5, 7–17; '552 Patent, Claims 10–11, 13–18, 20–22, 24–25, 28; '384 Patent, Claims 1–4, 6–15, 17–20, 22–24) | "a device that establishes a point of access for a wireless signal to another network" |

The Court **ORDERS** each party not to refer, directly or indirectly, to its own or any other party's claim-construction positions in the presence of the jury. Likewise, the Court **ORDERS** the parties to refrain from mentioning any part of this opinion, other than the actual positions adopted by the Court, in the presence of the jury. Neither party may take a position before the jury that contradicts the Court's reasoning in this opinion. Any reference to claim construction proceedings is limited to informing the jury of the positions adopted by the Court.

**SIGNED this 24th day of June, 2025.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE