**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTICT OF TEXAS
MARSHALL DIVISION**

SECURE WI-FI LLC,

        Plaintiff,

    v.

SAMSUNG ELECTRONICS CO., LTD. and
SAMSUNG ELECTRONICS AMERICA, INC.,

        Defendants.

Case No.: 2:24-CV-00047-JRG-RSP

**SAMSUNG'S MOTION FOR SUMMARY JUDGMENT
OF NONINFRINGEMENT OF U.S. PATENT NOS. 10,694,384, 9,961,552 and 9,717,005**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
797 F.3d 1020 (Fed. Cir. 2015) (*en banc*) .................................................. 29

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .............................................................................. 9

*Aylus Networks, Inc. v. Apple Inc.*,
856 F.3d 1353 (Fed. Cir. 2017) .............................................................. 23

Becton, Dickinson & Co. v. Tyco Healthcare Group, LP,
616 F.3d 1249 (Fed. Cir. 2010) .............................................................. 16

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .............................................................................. 9

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
363 F.3d 1263 (Fed. Cir. 2004) .............................................................. 10

*EMG Tech., LLC v. The Vanguard Grp., Inc.*,
No. 6:12-cv-543, 2014 WL 12597428 (E.D. Tex. June 24, 2014**)** ........................... 13, 20, 26

*Parallel Networks, LLC v. Abercrombie & Fitch Co.*,
704 F.3d 958 (Fed. Cir. 2013) ............................................................... 13, 20, 26

*Scott v. Harris*,
550 U.S. 372 (2007) .............................................................................. 10

*Toshiba Corp., v. Imation Corp.*,
681 F.3d 1358 (Fed. Cir. 2012) ............................................................... 9

*Travel Sentry, Inc. v. Tropp*,
877 F.3d 1370, (Fed. Cir. 2017) .............................................................. 29

*Zelinski v. Brunswick Corp.*,
185 F.3d 1311, (Fed. Cir. 1999) ............................................................ 12, 20, 26

**Rules**

Fed. R. Civ. P. 56 ................................................................................ 9

i

**TABLE OF CONTENTS**

I.     INTRODUCTION.............................................................................................. 1

II.    STATEMENT OF ISSUES ............................................................................... 1

III.   STATEMENT OF UNDISPUTED MATERIAL FACTS ("UMFs") ......................... 2

       A.    Undisputed Material Facts Relevant to "Server" Limitations ................................ 2

       B.    Undisputed Material Facts Relevant to "Determining" Step................................. 3

       C.    Undisputed Material Facts Relevant to "Authentic Device Identifier" Step .......... 6

IV.    LEGAL STANDARD ...................................................................................... 9

V.     ARGUMENT.................................................................................................. 10

       A.    The Accused Products Do Not Infringe Because They Do Not Include a "Server"
             Under the Court's Claim Construction ................................................................. 10

       B.    The Accused Products Do Not Infringe Because They Do Not "Determine . . . that
             the Access Point is an Authenticated Access Point" ........................................... 11

             1.    Dr. Akl misapplies the Court's construction of "access point." ............... 12

                   a.    The Court should clarify that  the claimed "access point" is hardware. ........... 13

                   b.    Dr. Akl's theory of infringement is non-sensical and legally unsupportable. ... 16

                   c.    Dr. Akl's alternative theory that identifying a network also identifies all devices
                         on that network is also unsupportable....................................................... 17

             2.    There is no genuine factual dispute that the information on which Dr. Akl
                   relies to show authentication is not "known, trusted, and verifiable." ..... 19

       C.    The Accused Products Do Not Infringe Because They Do Not "Transmit[]  . . . a
             Connection Request that Includes an Authentic Device Identifier" ..................... 22

             1.    The PMAC functionality on which Secure relies does not comply with the
                   hybrid approach to security addressed by the '384 patent........................ 22

             2.    The PMAC does not and cannot authenticate the end device................... 24

             3.    Secure's infringement theory requires impermissible divided
                   infringement........................................................................................ 28

VI.    CONCLUSION ............................................................................................. 29

**TABLE OF COMMONLY USED ABBREVIATIONS**

| Abbreviation | Description |
|---|---|
| Samsung | Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. |
| Secure | Secure Wi-Fi LLC |
| '384 patent | U.S. Patent No. 10,694,384 |
| '552 patent | U.S. Patent No. 9,961,552 |
| '005 patent | U.S. Patent No. 9,717,005 |
| POPR | Secure's Patent Owner Preliminary Response IPR2024-01367, Paper No. 7 |
| Asserted Patents | The '384, '552, and '005 patents |
| Asserted Claims | Claims 1-4, 6-14, 17-20, 22-24 of the '384 patent, claims 1-5 and 14-17 of the '005 patent, and claims 10-11, 13-18, and 20-22 of the '552 patent |

**TABLE OF EXHIBITS**

| Exhibit No. | Description |
|---|---|
| A | Dr. Akl's Opening Infringement Report |
| B | Dr. Wicker's Rebuttal Noninfringement Report |
| C | Dr. Akl's Deposition Transcript |
| D | IPR2024-01367, Paper No. 7 ("POPR") |
| E | Dr. Akl's Rebuttal Report on Validity |
| F | IEEE Standard Glossary of Computer Networking Terminology |
| G | *IEEE Wireless Dictionary* |
| H | Cisco™ What is Wi-Fi |
| I | Techpedia |
| J | Claim Construction (Markman) Hearing Transcript (June 3, 2025) |
| K | The '384 patent |

## I.    INTRODUCTION

Defendants Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. (collectively, "Samsung") hereby file this Motion for Summary Judgment of Noninfringement of U.S. Patent Nos. 10,694,384 (the "'384 patent"), 9,961,552 (the "'552 patent"), and 9,717,005, (the "'005 patent") (collectively, "the Asserted Patents") based on certain theories advanced by Secure Wi-Fi LLC ("Secure") and its expert Dr. Robert Akl.  As discussed herein, Secure's and Dr. Akl's theories of infringement are fatally defective for numerous reasons, including because they are either (1) legally impermissible for misapplying the Court's Claim Construction Order (D.I. 75) and contradicting the intrinsic record in order to rewrite the claims *post hoc* to create an issue of infringement, or (2) unsupported by any evidence that could create a genuine dispute of material fact, including Dr. Akl's own conclusory *ipse dixit*.

Viewing all evidence on which Secure and Dr. Akl rely in the light most favorable to Secure, the record is devoid of any evidence that the Accused Products perform the claimed methods or include the claimed systems of the Asserted Patents.  Because no reasonable jury could find infringement under the Court's construction, and because Secure cannot raise a triable issue of fact, Samsung is entitled to summary judgment of noninfringement on all of the Asserted Patents, as a matter of law, for the reasons discussed below.[1]

## II.    STATEMENT OF ISSUES

1.    Whether to grant summary judgment of noninfringement (both direct and indirect) as to all asserted '552 patent and '005 patent claims based on the Court's construction of "server."

---

[1] This brief addresses both Samsung's motions for summary judgment of noninfringement of all asserted claims (*see* Statement of Issues No. 2), and motions for partial summary judgment of non-infringement (*see* Statement of Issues Nos. 1 and 3).

2.      Whether to grant summary judgment of noninfringement (both direct and indirect) as to all Asserted Claims of all Asserted Patents because there is no functionality in the Accused Products that "determine[s] . . . that the access point is an authenticated access point."  Included within this issue are two sub-issues:  (1) Whether Dr. Akl misapplies the Court's claim construction of "access point" by opining that a Wi-Fi network satisfies the claimed "access point" despite not being hardware as required by the Court's use of the term "device" in the construction of "access point";[2] and (2) whether Secure and Dr. Akl fail to rely on any "known, trusted, and verifiable information" in their positions regarding alleged authentication of the claimed "access point" as required by the Court's construction of "authenticated access point."

3.      Whether to grant partial summary judgment of noninfringement (both direct and indirect) as to claims 1, 6-14, and 20 of the '384 patent, claims10-11, 13-18, and 20-22 of the '552 patent, and claims 1-5 and 14-17 of the '005 patent because there is no functionality in the Accused Products that "transmit[s] . . . a connection request that includes an authentic device identifier."

## III.    STATEMENT OF UNDISPUTED MATERIAL FACTS ("UMFS")

### A.      Undisputed Material Facts Relevant to "Server" Limitations

1.      The Court construed "server" and "mobile operating server"[3] in the asserted claims of the '005 and '552 patents to mean that the "cannot be part of or reside within the 'device' or 'end device' of the claims."  D.I. 75 at 14.

2.      All asserted '005 and '552 patent claims require that the end device "receiv[e]" or "obtain[] . . . from a server."  Ex. A ¶¶ 216, 267, 286, 312, 330.

---

[2] As addressed below in Section V.B.1.a, this is purely a legal issue, and Samsung respectfully requests that the Court clarify that its construction of "access point" as a "device" specifically refers to hardware.

[3] The parties agree that the terms "server" and "mobile operating server" mean the same thing, so Samsung refers to these terms interchangeably as "server."

3.      Dr. Akl concedes that he "do[es] not offer an opinion that the Accused Products practice step [1a] [receiving a fake device identifier from a mobile operating server]."  Ex. A ¶ 216.

4.      Dr. Akl concedes that he "do[es] not offer an opinion that the Accused Products practice step [14a] [obtain a fake device identifier from a mobile operating server]."  Ex. A ¶ 267.

5.      Dr. Akl concedes that he "do[es] not offer an opinion that the Accused Products practice step [10a] [receiving, from a server, . . .]."  Ex. A ¶ 286.

6.      For independent claims 15 and 21 of the '552 patent, Dr. Akl states that limitations [15a] and [21a] are identical to [10a] and incorporates his analysis of [10a].  Ex. A ¶¶ 312, 330.

**B.      Undisputed Material Facts Relevant to "Determining" Step**

7.      All asserted claims require that the end device: (1) "determin[e] . . . that the access point is an authenticated access point"  Ex. A ¶¶ 45, 122-129, 157, 188; and (2) "generat[e] . . . a fake [MAC] address."  *Id.* ¶¶ 45, 102, 155, 181-183.

8.      All asserted claims require that the end device: (1) "transmit[] . . . to an access point, a probe request."  Ex. A ¶¶ 45, 47, 49, 112, 221, 268, and (2) "receiv[e] … from an access point, a probe response."  *Id.* ¶¶ 45, 47, 49, 133, 160, 271, 299.

9.      The Court construed the term "access point" as "a ***device*** that establishes a point of access for a wireless signal to another network."  D.I. 75 at 19.  The Court construed the term "authenticated access point" to mean that the access point has a "verified identity based on known, trusted, and verifiable information."  *Id.* at 9, 18.

10.      Dr. Akl opines that the Accused Products satisfy the "determining" step of the asserted '384 patent claims by comparing the SSID and encryption-type information—sent by an access point in a probe response to an end device—to a list comprising that same information and residing in that end device.  *Id.* ¶ 68, 124, 127.  If the sent information matches the list, he contends,

3

the access point's identity is "verified." *Id.* ¶ 127 ("[T]he Accused Products compare the information [in the probe response] to the saved list to verify that it has previously connected.").

11.     Dr. Akl contends that the information in the probe response is "***known*** to the Accused Products, as [they are] stored on the Accused Products and used for the comparison." *Id.* Dr. Akl contends that the information is trusted because "the information resides on the Accused Products themselves, and the Accused Products ***trust*** the information to determine whether to automatically reconnect to the Wi-Fi network." *Id.* Dr. Akl contends that the information is "***verifiable***, as the Accused Products compare the information to the saved list to verify that it has previously connected." *Id.*

12.     The information on which Dr. Akl relies for purposes of his theory—SSID and encryption-type—is each a piece of information that is unencrypted and transmitted by access points in plaintext. Ex. B ¶¶ 155-558; Ex. C at 62:3-9, 124:19-22, 160:23-161:6. Any device located within the wireless range can read this information, and re-broadcast it as its own to mimic (*i.e.*, spoof) a legitimate access point. Ex. B ¶¶ 155-158; Ex. C at 62:3-9, 124:19-22, 160:23-161:6.

13.     The Accused Products include no functionality that can differentiate between a legitimate access point having the received SSID and encryption type and a malicious actor that has spoofed that information and is pretending to be a legitimate access point. Ex. B ¶¶ 153, 192-196; Ex. C at 160:23-161:6.

14.     The list on which Dr. Akl relies for purposes of his comparison theory (a "Wi-Fi networks list") is generated by the Accused Products and stored internally. Ex. B ¶¶ 67-68, 150. This list passively collects information from all nearby devices within range that are transmitting probe responses or acting as beacons. Ex. B ¶¶ 93, 117, 185-191. This list includes not only networks to which an Accused Product previously connected (*id.* ¶ 150), but also information

4

about (1) networks to which an Accused Product has never connected, as well as (2) any malicious devices that have spoofed legitimate access points by reading and re-broadcasting the SSID information being transmitted by the access point.  Ex. B ¶¶ 93, 117, 185-191.

15.     Secure did not object to the Court's construction of "access point."  D.I. 57 at 60, 61 80).

16.     Dr. Akl repeatedly opines that the "Wi-Fi network is an access point."  Ex. A ¶¶ 125, 235, 243.

17.     Dr. Akl contends that when the "Accused Product receives a probe response, it compares the information of that probe request to the access point list to determine whether the Wi-Fi network is an authenticated access point."  Ex. A ¶ 126.

18.     Dr. Akl states that an "SSID, or Service Set Identifier, is the identifier of a Wi-Fi network and used to 'distinguish [the] network from others.'"  Ex. A ¶ 111.

19.     Dr. Akl admits that "[a]ll devices in a network are connected to each other."  *Id*. ¶ 128.

20.     At the *Markman* hearing, Secure's counsel stated that "no one is debating that access points are . . . an access point is external to the – to the device, the claimed device."  Ex. J at 27:22-25.

21.     At the *Markman* hearing, Secure's counsel further stated, "No one disagrees that the access point is external."  *Id*. at 31:13.

22.     The Court asked Secure's counsel, "And why is the access point external if the server doesn't have to be external?"  *Id*. at 32:1-2.

23.     In response, Secure's counsel acknowledged, "I guess ***it's not a litigated issue*** . . . we all assume it's external . . . ."  *Id*. at 32:4-5.

5

24.     The Court recognized at the *Markman* hearing that the only dispute between the parties related to "access point" was whether "'access point' is limited to Wi-Fi networks.'" D.I. 75 at 5.

25.     The Court stated, "each of the claims at issue recites 'device,' 'access point,' and 'server' separately, giving rise to a presumption that each is a distinct component." *Id*. at 12.

26.     The Court stated, "[t]he 'device' is hardware, because it inherently includes a transmitter and receiver to transmit to and receive from the access point." *Id*. at 13.

27.     Yet, Dr. Akl explicitly now states, "I disagree that the term [access point] requires 'hardware.'" Ex. A ¶¶ 114, 232.

28.     Dr. Akl asserts that "Wi-Fi network is an access point." *Id*. ¶ 125.

29.     Dr. Akl concedes that "access points receiving a probe request will transmit back to the end-user device a probe response frame." Ex. A ¶ 118.

30.     Secure does not offer any other expert testimony addressing the "access point" limitations. *Id*. ¶¶ 51-80, 94-337.

31.     Dr. Akl concedes that "SSID is a service set identifier . . . it's a name of a Wi-Fi network." Ex. C at 45:23-25.

32.     Dr. Akl concedes that a "BSSID … relates to the MAC address of a specific access point." *Id*. at 46:11-13.

33.     The Asserted Patents teach Wi-Fi network can include multiple access points that broadcast the same network identifier (i.e., SSID). Ex. K at 3:54-58; Dr. Akl concedes this point. Ex. A ¶ 116.

**C.      Undisputed Material Facts Relevant to "Authentic Device Identifier" Step**

34.     Claims 1-4, 6-14, and 20 of the '384 patent and all asserted claims of the '552 and '005 patents require that the end device "transmit[s] . . . a connection request that includes an

6

authentic device identifier." Ex. A ¶ 130. Secure and Dr. Akl contend that this limitation is satisfied when an end device broadcasts a PMAC (explained in paragraph 35 below), which Secure and Dr. Akl contend is an "authentic device identifier" to access points to which the Accused Product wishes to re-connect. *Id.* ¶¶ 133, 254, 299.

35.    Secure admits that the functionality in the Asserted Patents is directed to a "hybrid approach" to device security. Ex. D at 1, 9, 24, 29-30. According to Secure's own IPR statements: "[A] method or system under the control of an end device . . . uses a 'fake' device identifier, such as a fake MAC address when transmitting a probe request to an access point. An authentic device identifier is then transmitted as part of the connection request to the access point, but only after determining the access point is authenticated. *Id.* at 1.

36.    A PMAC transmitted by an Accused Product is not transmitted only to an access point to which it wishes to connect, but rather the PMAC is broadcast by the Accused Product publicly (i.e., in unencrypted management frames including probe requests) on a given Wi-Fi network such that the PMAC can be read not only by all of the devices on that Wi-Fi network on which the Accused Product wishes to connect, but also any nearby device, which is not part of that Wi-Fi network, that may be listening. Ex. A ¶¶ 133, 254, 299; Ex. B ¶ 214. This can include devices on networks to which an Accused Product has previously connected, on networks to which an Accused Product has never connected, and any other malicious devices pretending to be legitimate access points. Ex. B ¶ 214; Ex. C at 172:2-25. Accordingly, a PMAC cannot be used to differentiate between legitimate end devices (e.g., a legitimate Accused Product) and a malicious device that is pretending to be a legitimate device by rebroadcasting that legitimate device's PMAC. Ex. B ¶ 214.

37.     Dr. Akl contends that an "authentic device identifier" is an identifier that is used to authenticate a device.    Ex. A ¶ 133.    Dr. Akl concedes that the Court's construction of "authenticated," although addressed in the context of an access point, applies equally in the context of describing an "authentic device identifier." *Id.*  Dr. Akl opines that the PMAC that an Accused Product broadcasts (1) is used to "verify the identity" of an Accused Product and (2) is a piece of information that is "known, trusted, and verifiable." *Id.*  In other words, as Dr. Akl contends, the PMAC is used by an access point or network to **authenticate** an Accused Product. *Id.*  In support of this opinion, Dr. Akl states that PMACs are stored on the Accused Products, and that a PMAC is used by the Accused Products to identify themselves to a network and are "known, trusted, and verifiable, as it allows the network to identify the Accused Product by verifying the information and trust it to provide functionality for the Accused Product." *Id.*

38.     The same PMACs are not used to identify the same Accused Product when an Accused Product communicates with networks.  Dr. Akl readily concedes that a device's own identifiers "could be changed." Ex. E ¶ 455.  Android generates a new PMAC for each SSID it encounters. Ex. B ¶ 215.  Moreover, any change in the SSID for a network will result in Android OS generating a new PMAC for purposes of connecting to that network.  Ex. B ¶ 215.  Additionally, any factory resets of the end device will result in changes to the PMAC, even where the SSID of the target network has not changed.  Ex. B ¶ 215.

39.     With respect to Dr. Akl's position that the PMAC "allows the network to identify the Accused Product by" performing certain actions including "verifying" and "trust[ing]" (*supra* ¶ 37), Dr. Akl identifies no programming, source code, documents, or other support for what an access point or network does when, according to Dr. Akl, it receives a PMAC that an Accused Product broadcasts.  Moreover, Dr. Akl does not identify anything remotely suggesting that

8

Samsung sells, maintains, programs, controls, or otherwise has any dominion (direct or indirect) over the functionality of access points and networks, and no such products are accused of infringement in this case.

40.    Dr. Akl concedes a MAC address is an address that is assigned to a product's network interface card and uniquely identifies the device.  Ex. A ¶63.

## IV.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56; *Toshiba Corp., v. Imation Corp.*, 681 F.3d 1358, 1361 (Fed. Cir. 2012) (citations omitted). Summary judgment is warranted if the non-movant bears the burden of proof and "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

When a motion for summary judgment is properly supported by documentary and testimonial evidence, the non-moving party may not rest upon the allegations or denials of its pleadings, but must instead present significant probative evidence to establish a genuine dispute of material facts.  *Id.* at 327; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) ("[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.").  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is "genuine" only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson,* 477 U.S. at 247-48.  "If the evidence is merely colorable … or is not significantly probative . . . summary judgment may be granted."  *Id.* at 249-50.  The Court need not accept any so-called fact that is merely identified as such by the non-moving party as true.  *See*

9

*Scott v. Harris*, 550 U.S. 372, 380 (2007) (refusing to accept opposing party's version of the facts, which was "so utterly discredited" by the evidence that "no reasonable jury could have believed him"); *see also id* at 381 n. 8 (all inferences are drawn in favor of the nonmoving party only "**to the extent supportable by the record**").  Moreover, an expert's conclusory statement on an issue without analysis is insufficient to create a genuine dispute of material fact.  *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1277–78 (Fed. Cir. 2004) (affirming ruling that the conclusory statements of two of the plaintiff's experts did not create a genuine dispute of material fact).

## V.    ARGUMENT

### A.    The Accused Products Do Not Infringe Because They Do Not Include a "Server" Under the Court's Claim Construction

The Court's construction of "server" is dispositive and confirms noninfringement of all asserted '005 and '552 patent claims.  The Court construed "server" to mean that the "server cannot reside within the 'device' or 'end device' of the claims."  UMF ¶ 1.  Thus, based on the Court's construction, the claimed "server" and claimed "device" (or "end device") must be physically separate.[4]  UMF ¶ 1.

Dr. Akl admits that he has no opinion on infringement if the Court's claim construction is adopted.  UMF ¶¶ 3-5.  Accordingly, because Dr. Akl has not presented such an opinion and because Secure presents no valid basis on which to overturn Judge Payne's construction (*see* D.I. 80), Samsung is entitled to summary judgment of noninfringement of all asserted '005 and '552 patent claims as a matter of law.  The absence of any evidence that the Accused Products

---

[4] For the reasons addressed in Samsung's responses to Secure's objections to Judge Payne's claim construction order, Secure's objections should be overruled in their entity, and Judge Payne's order should be adopted in full.  *See* D.I. 80.

include a "server" that is physically separate from the device is fatal to Secure's infringement claims.

**B.      The Accused Products Do Not Infringe Because They Do Not "Determine . . . that the Access Point is an Authenticated Access Point"**

All Asserted Claims require that the end device "determine . . . that the access point is an authenticated access point." UMF ¶ 77. As an initial matter, all Asserted Claims require that an ***access point*** (as opposed to some other equipment or structure) be authenticated. The Court construed the term "access point" as "a ***device*** that establishes a point of access for a wireless signal to another network." *Id.* ¶ 9. The Court also construed "authenticated access point" to mean "an access point that has a verified identity based on known, trusted, and verifiable information." *Id.* Thus, to infringe the Asserted Claims, the end device must (1) verify the identity of the device that establishes a point of access for a wireless signal to another network, and (2) do so based on known, trusted, and verifiable information. There is no genuine dispute of material fact on either prong.

Secure and Dr. Akl fail to satisfy the first prong because they conflate a Wi-Fi network with the claimed "access point." Dr. Akl presents two theories of infringement—first that a Wi-Fi network is the claimed "access point," and second that identifying a Wi-Fi network necessarily identifies all devices within that network, including all components such as access points. As discussed below, both theories disregard the Court's construction that an "access point" is a physical device—i.e., hardware (which Samsung respectfully requests that the Court clarify). Accordingly, to the extent Secure and Dr. Akl can show that anything is "authenticated," it is a network, not the claimed "access point" (a physical device).

Secure and Dr. Akl fail to satisfy the second prong of the authentication requirement because, even if a Wi-Fi network is the same as the claimed "access point," Dr. Akl fails to show

11

that that the Accused Products "verify the identity" of any such Wi-Fi network "based on known, trusted, and verifiable information" as required by the Court's construction. As discussed below, there is no genuine material dispute that the information on which they rely to show authentication (SSID and encryption-type) is not "known, trusted, and verifiable."

Accordingly, Samsung is entitled to summary judgment of noninfringement as a matter of law because there is no functionality in the Accused Products that "determine[s] . . . that the access point is an authenticated access point."

### 1. Dr. Akl misapplies the Court's construction of "access point."

Samsung is entitled to summary judgment of noninfringement as a matter of law because a Wi-Fi network cannot be the claimed "access point" based on the Court's claim construction. The Court construed "access point" to mean a "device that establishes a point of access for a wireless signal to another network." UMF ¶ 2. Thus, for the Accused Products to satisfy this limitation, the Accused Products must authenticate a "device . . . that establishes a point of access . . . to another network." *Id.* It is undisputed that Dr. Akl's theory of infringement relies on showing that the Accused Products authentic a Wi-Fi network rather than an access point. This is confirmed by Dr. Akl's reliance on SSID for his authentication theory. As Dr. Akl concedes, the SSID identifies a network, which may comprise multiple access points, whereas a separate identifier—called a BSSID— uniquely identifies a distinct access point. UMF ¶¶ 31, 3332.

Simply put: Secure cannot rewrite the claims or ignore the Court's construction to fit its infringement theory. Accordingly, because Dr. Akl relies on no evidence showing that the Accused Products authenticate an "access point" as required by the Asserted Claims, and instead misapplies the Court's construction, Samsung is entitled to summary judgment of noninfringement as a matter of law. *Zelinski v. Brunswick Corp.*, 185 F.3d 1311, 1317 (Fed. Cir. 1999) (conclusory statement of patentee's expert insufficient to defeat summary judgment); *Parallel Networks, LLC*

*v. Abercrombie & Fitch Co.*, 704 F.3d 958, 970 (Fed. Cir. 2013) (*ipse dixit* testimony insufficient to preclude summary judgment); *EMG Tech., LLC v. The Vanguard Grp., Inc.*, No. 6:12-cv-543, 2014 WL 12597428, at *3 (E.D. Tex. June 24, 2014**)** ("say-so" testimony of plaintiff's expert insufficient to defeat summary judgment of noninfringement) (citing *Parallel Networks*).

a.   <u>The Court should clarify that<br>the claimed "access point" is hardware.</u>

Dr. Akl's theory of infringement fails because Dr. Akl readily acknowledges that a Wi-Fi network is ***not hardware***, and therefore fails to be a "device" under the Court's construction of "access point." Samsung respectfully requests that the Court clarify that its construction of "access point" refers to hardware and not to non-physical, non-hardware constructs like a Wi-Fi network. Indeed, in connection with the construction of the "server" term, the Court recognized that the claimed "'device' is hardware, because it inherently includes a transmitter and receiver to transmit to and receive from the access point." D.I. 75 at 13. It follows that an "access point," which the Court construed to be a "device," must also be hardware. Indeed, just like the Accused Product (the "device"), it is undisputed that the claimed "access point" receives and transmit information, which is confirmed by the plain language of the claims requiring that the claimed "end device" transmit information to, and receive information from, an "access point." UMF ¶ 8.

Dr. Akl presents no opinion that a Wi-Fi network is hardware; in fact, such a position is readily contradicted by the meaning of "network" which refers to "[a]n arrangement of components, or nodes, and interconnecting branches." Ex. F at 27. A wireless network such as a Wi-Fi network is merely a network that is connected wirelessly, *e.g.*, through protocols such as 802.11.[5] Ex. G at 98. Thus, as these definitions make clear, a "network" is merely the

---

[5] *See also* Ex. H at 2 ("Wi-Fi networking technology is a wireless networking technology that allows ***devices*** such as computers (laptops and desktops), mobile ***devices*** (smart phones and

13

*arrangement* of nodes on the network, which can include anything from phones, computers, printers, access points, and any number of other hardware devices.  The "network" is entirely distinct from the hardware that uses the network to connect with each other.  Accordingly, Secure cannot credibly dispute that a Wi-Fi network is *not hardware*, and not a "device" as required by the Court's construction of "access point."

Samsung's request for clarification is not untimely and directly results from Dr. Akl's opinions contradicting Secure's representations to the Court at the *Markman* hearing.  Until Dr. Akl submitted his opinions, Samsung reasonably understood that the parties did not dispute that an "access point" referred to hardware.  Indeed, Secure's attorneys repeatedly represented to the Court that the "access point" is *external* to the "device."  UMF ¶¶ 2020-2321.  Dr. Akl's theory directly contradicts these representations because it would allow the "access point" to include the end device.  As discussed above, a Wi-Fi network is merely a network that allows multiple devices to connect wirelessly.  If the Wi-Fi network is the "access point," and the end device is also part of that Wi-Fi network by virtue of connecting to that network, then the "access point" is no longer *external* to the end device.  And because the claimed "end device" must authenticate an "access point" as required by the plain letter of the claims, Dr. Akl's theory means that the "end device" must authenticate itself.  This result is non-sensical, and contradicts the Court's Claim Construction Order, wherein Judge Payne rejected the same non-sensical positions Secure advanced in the context of other claim constructions.  Specifically, in the context of the "server" terms, the Court understood Secure to be arguing that the claimed "server" "must be software that

---

wearables), and other *equipment* (printers and video cameras) to interface with the Internet. It allows these *devices*—and many more—to exchange information with one another, creating a network."  https://www.cisco.com/c/en/us/products/wireless/what-is-wifi.html (last visited July 28, 2025). *See also* Ex. I at 6 ("Wireless networks are networks that use radio waves to connect *devices* . . . .").

is also part of the physical 'device.'" D.I. 75 at 13. The Court rejected Secure's position, finding that this "would mean the device is receiving from the 'server' part of itself, which is a ***strained reading*** of these limitations." *Id.* Moreover, the Court recognized that "[a] skilled artisan would understand" the claims—directed to transmitting and receiving information—to be referring to communications "to and from the end device—not component-to-component communications *within* the end device." *Id.* The same reasoning applies here and further confirms that Secure's and Dr. Akl's position regarding "access point" is legally unsupportable.

Additionally, Secure had the opportunity to address during claim construction whether an "access point" and Wi-Fi network could be the same thing, but Secure's counsel chose not to do so. Indeed, Samsung proposed a construction of "access point" as ***equipment*** that provides connectivity between devices over one or more ***Wi-Fi*** networks. D.I. 60. The dispute was whether an access point provided connectivity between Wi-Fi networks or could include other types of networks. UMF ¶ 24. Judge Payne agreed with Secure, holding that that access points could provide connectivity to different types of networks. D.I. 75. But at no point during briefing or oral argument did Secure ever contend that the claimed "access point" not only could provide connectivity to a network but ***could be a network in itself*** (*i.e.*, something other than hardware). D.I. 57, 61, 72. And nowhere in its Claim Construction Order did the Court make any such holding. D.I. 75.

Secure had every opportunity to object to or seek clarification of the Court's construction of "access point," but it did not do so. UMF ¶ 15. Its current attempt to inject ambiguity or create a factual dispute regarding the meaning of "access point" is both procedurally improper and legally insufficient to defeat summary judgment. By conflating different words used in the Court's construction after the fact, and attempting to circumvent and relitigate its own arguments, Secure

and its expert are again violating basic claim construction principles under *Phillips* and *Becton* and advancing yet another spurious position that Judge Payne has already recognized is a "strained reading" of the claims. D.I. 75 at 13. The Court should reject Secure's tactics and clarify that the term "device" as used in the Court's construction of "access point" means hardware.

b. <u>*Dr. Akl's theory of infringement is non-sensical and legally unsupportable.*</u>

Even without the Court clarifying its construction of "access point" as hardware, Dr. Akl's theory is nonsensical for reasons other than that it would require the claimed "end device" to authenticate itself. Dr. Akl's theory relies on the same Wi-Fi network to be both the "device" and the "network" in the Court's construction of "access point" as a "***device*** . . . that establishes a point of access . . . to another ***network***." UMF ¶ 9. Using the same Starbucks Wi-Fi network referenced in Samsung's *Markman* demonstratives in the context of the Court's construction of "access point," Dr. Akl's theory would mean that the Starbucks Wi-Fi network is the "device that establishes a point of access . . . to [the Starbucks Wi-Fi] network." Thus, under Dr. Akl's logic, a network can be the point of access to itself. This makes no sense and also violates the principle that different words used in a claim (or in a Court's claim construction) are presumed to refer to distinct components.

An "access point" (one claim element) is presumed to be distinct from other claim elements, including, for example, "server," for the same reasons the Court found "server" to be a distinct component compared to the claimed "device" / "end device." UMF ¶ 25; *Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) ("Where a claim lists elements separately, the clear implication of the claim language is that those elements are distinct components of the patented invention.") (internal quotation marks omitted). Secure cannot legitimately rebut this presumption because nothing in the intrinsic evidence provides any

16

disclosure that the alleged inventions are meant to cover "access points" that provide a point of access to themselves. Like "server," the intrinsic evidence readily confirms that an "access point" is something that provides access to something else, namely a network.[6] Thus, Secure cannot rebut the presumption that "device" and "network" as used in the Court's construction of "access point," can refer to the same structure (namely, a "Wi-Fi network").

Moreover, as discussed above, Secure's attorneys represented to the Court that the "access point" was *external* to the "end device." If the "access point" can be the network or any component within it, including the end device, as Dr. Akl's theory requires (*supra* p. 13), then the requirement of a distinct, external hardware "access point" is rendered meaningless.

### c.   *Dr. Akl's alternative theory that identifying a network also identifies all devices on that network is also unsupportable.*

Dr. Akl's alternative theory fares no better and is also legally impermissible. According to Dr. Akl, the act of determining or selecting a Wi-Fi network inherently includes determining an "access point" because the network comprises hardware devices. Ex. A ¶ 128. Specifically, Dr. Akl draws a box around "a Wi-Fi network" explaining that it "can include one or more interconnected Wi-Fi access points that each communicate with each other as well as end devices (such as the Accused Products)" as illustrated by the figure Dr. Akl cites shown below. *Id.*; UMF ¶ 33.

---

[6] This is further confirmed in the claims themselves. For example, claim 7 of the '384 patent (Ex. K at claim 7) uses the words "network" *and* "access point" together in the same claim, thus reaffirming that these two structures cannot be the same and refer to "distinct components." *Becton*, 616 F.3d at 1254.



*Id.*  Dr. Akl's opinion is legally flawed for two reasons.  First, Dr. Akl's opinion is excluded by the Court's construction.  As explained above, the Court has expressly defined "access point" as "a device that establishes a point of access for a wireless signal to another network."  D.I. 75 at 18; UMF ¶ 9.  This definition excludes non-physical, non-hardware constructs like networks or identifiers for such networks (*i.e.*, SSIDs) as being within the scope of the claimed access point "device."

Second, Dr. Akl concedes, an SSID identifies a network, while a different identifier (a BSSID) identifies an access point.  Ex. C at 45:21-46:21. Thus, Dr. Akl admits that identifying a network is distinct from identifying a unique, particular, and distinct component device within that network.  Stated differently, Dr. Akl concedes that merely identifying an SSID says nothing about the identification of specific hardware such as the access points (that are identified by individual BSSIDs).  *Id.*  Any number of analogies confirm why Dr. Akl's position is wrong.  For example, a group chat via iMessage or WhatsApp can be given a name, *e.g.*, "Birthday Bash!".  The members of the group chat are identified by their phone number or handles.  The name "Birthday Bash!" does not identify any specific member of the chat group.  Similarly, the name of a network

18

(SSID), like the name of the group chat, does not identify the constituent devices connected to that network, which are identified by other identifiers (such as BSSIDs).

### 2. There is no genuine factual dispute that the information on which Dr. Akl relies to show authentication is not "known, trusted, and verifiable."

Even if the Court were to find that a Wi-Fi network is within the scope of the claimed "access point" as Secure and Dr. Akl contend, there is still no genuine factual dispute that the information on which Dr. Akl relies to show authentication is not "known, trusted, and verifiable," as required by the Court's claim construction. Dr. Akl's sole infringement theory is that the Accused Products compare SSID and encryption type-information received from an access point in a probe response to the same information contained in a list that the Accused Products generate and store internally. UMF ¶ 10. If the information matches, he contends, the access point's identity is "verified." *Id.*

Dr. Akl's theory of infringement misses the mark and cannot create genuine dispute on infringement. His approach, based on mere comparison between received information and stored information is akin to a security guard at the Oscars letting in anyone who says they're Matthew McConaughey simply because that name appears on the guest list. Authentication by comparison is certainly possible—but only when both the received information and information to which the received information is compared (e.g., a list) are known, trusted, and verifiable. Indeed, such authentication can occur in numerous contexts. For example, an individual may be authenticated as an allowed guest and gain entry into a club by communicating a code phrase that matches with a code phrase on a list. Or a submarine may authenticate the legitimacy of a strike order by comparing a code received as part of a transmission with a list of codes stored in the submarine's safe. In each of these cases, the information's legitimacy is reasonably assured. Here, it is not.

19

First, there can be no dispute that the SSID and encryption-type information received by an Accused Product as part of a probe response are *not* known, trusted, and verifiable.  Dr. Akl includes no opinions in his expert report explaining how this information is "known, trusted, and verifiable."  At most, he contends that the information is known because it is communicated.  Ex. A ¶ 12711.  Even accepting this position as valid, despite it being non-sensical,[7] Dr. Akl's assertion that the information is also "trusted, and verifiable" (each of which must also be satisfied based on the Court's construction) is entirely conclusory and cannot defeat summary judgment of noninfringement.  *Zelinski*, 185 F.3d at 1317; *Parallel Networks,* 704 F.3d at 970; *EMG Tech*, 2014 WL 12597428 at *3.

The untrustworthiness and unverifiability of SSID and encryption-type information for purposes of authentication cannot legitimately be disputed.  Indeed, there is no factual dispute that "SSID" and "encryption type" are unencrypted and transmitted in plaintext and are therefore easily spoofed.  UMF ¶ 1212.  Any device nearby can read this information.  *Id*.  And any malicious device can simply re-broadcast this information to mimic (*i.e.*, spoof) a legitimate access point.  *Id*.  Accordingly, the Accused Products cannot differentiate between a legitimate access point having the received SSID and encryption-type and a malicious actor that has spoofed that information and is pretending to be the legitimate access point.  *Id.*  Stated differently, the Accused Products cannot, and do not, "verify the identity" of an access point based on SSID and encryption-type informaiton.  The ability to differentiate a legitimate access point from an illegitimate one is fundamental to the notion of identity verification required by the Court's construction.  Thus, even

---

[7] Under Dr. Akl's theory, all information would be "known" simply because it is communicated by a speaker.  Of course, this makes no sense.  History has provided us with innumerable examples of charlatans proclaiming to be something they're not, or purporting to sell products with magical properties.  The adage, "Don't believe everything you hear" is particularly relevant, and a fundamental tenet of any authentication protocol that Dr. Akl's theory of infringement ignores.

20

if such information could be considered "known," it is not "trusted." And because of the unencrypted, plaintext nature of the information and fact that such information is available to any device capable of listening for transmissions containing this information, it is not "verifiable." In other words, one cannot merely take the SSID and encryption-type information at face value and *verify* that such information is legitimate, just like a security guard cannot accept at face value somebody merely saying that they are Matthew McConaughey.

Second, there can be no dispute that the SSID and encryption-type information on the list generated by, and residing within, the Accused Product (and used for comparison under Dr. Akl's theory) is also not "known, trusted, and verifiable." The SSID and encryption-type information on this list do not come from some secure source, but rather originate with the access point that sends that information in the probe response. Thus, Dr. Akl's comparison theory is akin to an Oscars red carpet guest list created from information supplied by members of the general public. But there can be no dispute that the security guard seeking to ensure that only invited celebrities gain access to the red carpet cannot authenticate legitimate guests via the guest list because the information used to generate the list is not trustworthy—it's spoofable.

So too, here, Dr. Akl's theory amounts to nothing more than comparing easily spoofable data received from an access point (SSID and encryption type) with the same data that Accused Products simply record in a list, which also originate from an access point. This is not authentication under the Court's construction. Dr. Akl's theory of infringement is entirely unsupportable and falls squarely in line with the example of the uninvited guest who gains entry to the Oscars award by taking advantage of an untrustworthy system that can in no way verify identity, and unlike other examples of actual authentication based on a comparison of known, trusted, and verifiable information.

21

For the foregoing reasons, there is no genuine dispute of material fact concerning the functionality on which Dr. Akl relies, and Samsung is entitled to summary judgment of noninfringement as a matter of law because there is no functionality in the Accused Products that "determine[s] . . . that the access point is an authenticated access point" under the Court's construction of "authenticated access point."

**C.     The Accused Products Do Not Infringe Because They Do Not "Transmit[] . . . a Connection Request that Includes an Authentic Device Identifier"**

Claims 1-4, 6-14, and 20 of the '384 patent and all asserted claims of the '552 and '005 patents each require that the end device "transmit[] . . . a connection request that includes an authentic device identifier." UMF ¶ 3434. Secure and its expert contend that this limitation is met when the end device transmits a PMAC. *Id*. In other words, they argue that the PMAC is the "authentic device identifier." *Id*. As discussed below, a "PMAC" cannot satisfy this limitation as a matter of law for two reasons: (1) the PMAC falls outside of the functionality covered by the Asserted Patents based on Secure's own admissions, and (2) the PMAC does not and cannot identify the ***authenticity*** of the end device. Accordingly, Samsung is entitled to summary judgment of noninfringement as a matter of law. And even if the Court believes that there is a genuine factual dispute, Samsung nevertheless is still entitled to summary judgment of noninfringement because Dr. Akl's theory requires performance by actors that Samsung does not directly or indirectly control and therefore is impermissible under well-settled law relating to divided infringement.

**1.      The PMAC functionality on which Secure relies does not comply with the hybrid approach to security addressed by the '384 patent.**

As discussed above, the Asserted Claims follow a two-step security model that Secure itself has described consistently as a "hybrid approach" in its successful bid to overcome prior art. UMF ¶35 35. According to Secure's own IPR statements:

> [A] method or system under the control of an end device . . . uses a "fake" device identifier, such as a fake MAC address when transmitting a probe request to an access point. An authentic device identifier is then transmitted as part of the connection request to the access point, but only after determining the access point is authenticated.[8]

*Id.* These statements are binding. *See Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1362 (Fed. Cir. 2017) (public entitled to rely on patent owner's binding statements made during IPR). Claims 1-14, 6-14, and 20 of the '384 patent and all asserted claims of the '552 and '005 patents expressly implement this 2-step process as Secure has admitted in its IPR response. The Accused Products, however, do not.

As discussed above, Secure and Dr. Akl contend that the Accused Products "authenticate" access points by comparing SSID and encryption-type information received by an access point to the same information (from the same source) that is recorded on a list that is generated within the Accused Products and stored locally. UMF ¶ 10. Then, after a match is found, the Accused Products send a PMAC (what Secure and Dr. Akl contends is the "authentic device identifier") to the access point. *Id.* But even accepting Secure and Dr. Akl's positions as undisputed, there still is no infringement for two reasons.

First, as discussed above, the Accused Products do not authenticate an access point, and, accordingly, there is no authentication that takes place before the Accused Products send what Secure contends is the product's ***authentic*** identifier. Stated differently, prior to revealing its true self under Secure's theory, an Accused Product does not determine the legitimacy of an access point; there is no step where the PMAC is withheld until trust is established. This is the equivalent

---

[8] As discussed in Samsung's motion for summary judgment of ineligibility under 35 U.S.C. § 101, filed contemporaneously herewith, this hybrid approach is akin to a celebrity using a fake name to make a hotel reservation and only revealing their true name to trusted hotel staff once inside the hotel (and confirming that they are, in fact, at the correct hotel). It's nothing more than an abstract idea with no inventive concept.

23

of the celebrity posting their location on social media *before* arriving at the hotel where they've reserved a room under a fake name, which defeats the entire point of concealment.

Second, even if the Court were to accept Secure's flawed theory of authentication, the Accused Products fail to satisfy the second step in Secure's "hybrid approach" whereby a device reveals its true self to an access point that has been determined to be legitimate. This is because the PMAC is not transmitted only to the authenticated access point, which Dr. Akl readily acknowledges. *Id.* ¶ 3636. Instead, the Accused Products publicly broadcast the PMAC in unencrypted management frames, including probe requests. *Id.* Returning to the celebrity analogy, this scenario is no different from a celebrity concealing their identity when making a hotel reservation but then announcing their true identity on a public loudspeaker upon arrival. Communicating your true identity to *both* the hotel staff discreetly *and* the general public completely eviscerates the purpose underlying the original concealment of identity. So too here, the claims require that the authentic device identifier be transmitted *to the authenticated access point*—not to everyone. Secure's theory of infringement collapses under its own logic.

### 2.    The PMAC does not and cannot authenticate the end device.

Secure's theory fails for the independent reason that the PMAC is not a piece of "known, trusted, and verifiable information" that is used to "verify the identity" of an Accused Product. In other words, a PMAC is not used to authenticate an Accused Product at all.

Dr. Akl concedes that an "authentic device identifier" is one that identifies the legitimacy of the end device. *Id.* ¶ 37 37. This plain-meaning interpretation aligns with the entirety of the intrinsic record and Secure's own admissions that the Asserted Patents describe a method for concealing a device's true identity behind a fake one, then revealing the device's true identity to a trusted recipient (i.e., the "authenticated access point"). *Id.* ¶ 35 35. Consistent with this method, as Dr. Akl himself concedes, is the need to determine that the identity of the end device is *true*—

*i.e., authentic*.  *Id.* ¶ 3737.  Just like a certificate of authenticity for a painting or a trademark for a handbag, the "authentic device identifier" required by the Asserted Claims must point to the genuine origin of the device.  And to do that, the identifier must be capable of authenticating the device—that is, by being capable of verifying its identity.  And by definition according to the Court's claim construction, the identifier must be "known, trusted, and verifiable information." D.I. 75 at 9 (addressing construction of "authenticated").

There is no dispute that the PMAC does none of what the claims require.  The PMAC does not reveal the true origin of the device, and it plays no role in any authentication mechanism, as the undisputed facts confirm.  A PMAC is, at bottom, a *fake* identifier, not an authentic one.  Dr. Akl nevertheless argues that the PMAC is used to authenticate the Accused Products because

> (1)    PMACs are stored on the Accused Products,
>
> (2)    PMACs are used by the Accused Products to identify themselves to the network, and
>
> (3)    a PMAC is "known, trusted, and verifiable, as it allows the network to identify the Accused Product by verifying the information and trust it to provide functionality for the Accused Product."

*Id.* ¶ 3837.  But as Dr. Akl concedes, the Court's construction of "authenticated," although addressed in the context of an access point, applies equally in the context of describing an "authentic device identifier."  *Id.*  Thus, to qualify as an "authentic device identifier," the PMAC must be used to "verify the identity" of the end device and it must itself be "known, trusted, and verifiable."  There is no genuine dispute that the PMAC fails to meet either of these authentication elements under the Court's construction.

Even assuming that the Accused Products store PMACs and use them to identify themselves (prongs 1 and 2 of Dr. Akl's theory), this identification is not a *verification of identity* as required under the Court's construction.  Just because Dr. Akl says it does not make it so.

*Zelinski*, 185 F.3d at 1317; *Parallel Networks,* 704 F.3d at 970; *EMG Tech*, 2014 WL 12597428 at *3. Indeed, if Dr. Akl's logic is accepted, anyone could walk up to the White House gate, claim to be a legitimate and pre-vetted visitor, and be granted access. But saying who you are is not equivalent to proving it. The fact that an Accused Product communicates its PMAC (which indisputably is spoofable) is not verification that the end device is who it says it is.

Dr. Akl tries to bridge this gap by making the purely conclusory assertion that the PMAC "allows the network to identify the Accused Product by verifying the information and trust it to provide functionality for the Accused Product." Ex. A ¶ 13337. Dr. Akl relies on this statement to conclude that the PMAC is information that is "known, trusted, and verifiable" (prong 3 of Dr. Akl's theory). *Id.* Dr. Akl never explains how the network actually *verifies* and *trusts* the PMAC; he points to no functionality that allows an access point or a network to distinguish a legitimate device from a malicious actor spoofing the same PMAC—because no such functionality exists. *Id.* ¶¶ 130-13336.

Indeed, as discussed above, it is undisputed that the Accused Products broadcast its PMAC in plaintext in the headers of each frame, including its probe request frame, which is accessible via any nearby device, including by both legitimate access points and any malicious actors. UMF ¶ 36. Any nearby device—legitimate or malicious—can read and spoof a PMAC because there is no cryptographic signature, certificate, or other key that binds a PMAC to a legitimate Accused Product. *Id.* Consequently, an access point has no way to differentiate between a genuine client and a spoofed clone. *Id.* Dr. Akl's conclusory and unsupported assertion that a PMAC is information that is "known, trusted, and verifiable" cannot create a genuine issue of material fact. *Zelinski*, 185 F.3d at 1317; *Parallel Networks,* 704 F.3d at 970; *EMG Tech*, 2014 WL 12597428 at *3.

Multiple undisputed facts that Dr. Akl ignores confirm that PMACs are *un*trustworthy and *un*verifiable and thus cannot identify the authentic nature of an Accused Product as required by the claims. *First*, the same PMAC is not used to identify the same device when communicating with access points or networks. *Id.* ¶ 3838. For example, it is undisputed that Android generates a new PMAC for each SSID it encounters. *Id.* A device communicating with 1,000 different networks through one access point will send 1,000 different PMACs. And even where only one network is available through a single access point, the device's PMAC can still change. For example, a change in SSID will yield a new PMAC. *Id.* And factory resets of the end device will also change the PMAC. *Id.* In short, the PMAC identifier is transient; it cannot represent the device's *true* identity because it is unstable and changes as Dr. Akl himself recognizes. *Id.*

*Second*, the PMAC also plays no role in any authentication mechanism. An authentic identifier must be capable of verifying the identity of an object. A certificate of authenticity can be used to "verify the identity"—i.e., the genuine origin of—a work of art or another collectible because that certificate is "known, trusted, and verifiable." A government-issued form of identification such as a driver's license can be used to "verify the identity" of a person because that license provides information that is "known, trusted, and verifiable;" police officers authenticate individuals every day during traffic stops using this approach. A manufacture-assigned MAC address can be used to identify the genuine origin of an electronic device based on the standardized protocol by which such MAC addresses are used by device manufactures, as Dr. Akl concedes. *Id.* ¶ 40 40. The original MAC address stamped on a piece of hardware is "known, trusted, and verifiable." But Dr. Akl identifies no functionality that exists in the Accused Products or in any standard that relies on the PMAC to identify the genuine origin of an end device such as

27

the Accused Products because, as discussed above, a PMAC is not "known, trusted, or verifiable." *Id.* ¶ 3936.

In short, the PMAC is not an ***authentic*** device identifier.  Instead, like a randomized MAC address, it is another ***fake*** device identifier, which cannot satisfy the "authentic device identifier" requirements of claims 1-4, 6-14, and 20 of the '384 patent.  The Court flagged this very issue in its Claim Construction Order, noting that Secure's apparent theory that a fake identifier could still be authentic (i.e., "some sort of 'authentic' fake identifier") is "[not] satisfying, and . . . a tough sell based on the plain language of the claims."  D.I. 75 at 20.

For the foregoing reasons, there is no genuine issue of material fact regarding whether the Accused Products satisfy the limitation requiring "transmitting . . . a connection request that includes an authentic device identifier" and Samsung is entitled to summary judgment of noninfringement of claims 1-4 and 6-14 of the '384 patent as a matter of law.

### 3. Secure's infringement theory requires impermissible divided infringement.

Dr. Akl's theory, when distilled to its basic premise, requires performance of authentication by ***multiple actors***.  Indeed, as addressed above, Dr. Akl's theory is that the access point or the network authenticates an end device using the PMAC.  *Id.* ¶¶ 3637, 38 39.  And, for this reason, an end device's PMAC is an "authentic device identifier." *Id.*  Stated differently, under Dr. Akl's view, without the access point or network performing some procedure to use the PMAC to determine whether the end device is of genuine origin, the PMAC itself (which is generated by Android on the end device) would fail to be an identifier that is used to authenticate the end device. *Id.*

Under Dr. Akl's theory, there can be no infringement by Samsung in this scenario based on black letter law governing divided infringement.  Because Secure does not contend, and does

not rely on any evidence, that Samsung programs or otherwise maintains, directs, or controls the functionality of access points or networks (either directly or indirectly) (*id.* ¶ 39), Samsung cannot infringe based on the theory propounded by Dr. Akl. *See Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020 (Fed. Cir. 2015) (*en banc*) ("Direct infringement under § 271(a) occurs where all steps of a claimed method are performed by or attributable to a single entity."); *Travel Sentry, Inc. v. Tropp*, 877 F.3d 1370, 1376 (Fed. Cir. 2017).

For this independent reason, Samsung is entitled to summary judgment of noninfringement of claims 1, 6-14, and 20 of the '384 patent, claims 10-11, 13-18, and 20-22 of the '552 patent, and claims 1-5 and 14-17 of the '005 patent as a matter of law.

## VI.    CONCLUSION

For the foregoing reasons, Samsung respectfully requests that the Court grant Samsung's Motion for Summary Judgment of Noninfringement.

29

Date: July 28, 2025

*/s/* R. Paul Zeineddin
R. Paul Zeineddin
Paul.Zeineddin@BlankRome.com
D.C. Bar No. 474734 (Admitted E.D. Tex.)
**BLANK ROME LLP**
1825 Eye Street NW
Washington, DC 20006
(202) 470-2781

-and-

Melissa R. Smith
State Bar No. 24001351
melissa@gillamsmithlaw.com
**GILLAM & SMITH, LLP**
303 S Washington Avenue
Marshall, TX 75670
Tel.: (903) 934-8450
Fax: (903) 934-9527

Joshua S. Reisberg
Josh.Reisberg@BlankRome.com
**BLANK ROME LLP**
1271 Avenue of the Americas
New York, NY 10020
(212) 885-5000

Michael F. Reeder
State Bar No. 24070481
michael.reeder@blankrome.com
**BLANK ROME LLP**
717 Texas Avenue Suite 1400
Houston, TX 77002
(713) 815-3318

Sean D. Damon
D.C. Bar No. 1014471 (Admitted E.D. Tex.)
Sean.Damon@blankrome.com
**BLANK ROME LLP**
1825 Eye Street NW
Washington, DC 20006
(202) 420-2200

*Attorneys for Defendants Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.*

30

**CERTIFICATE OF SERVICE**

The undersigned certifies that all counsel of record were electronically served with a copy of the foregoing on July 28, 2025, via electronic mail.

*/s/ Melissa R. Smith*
Melissa R. Smith